THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

L.J., a minor, individually
and by his Parents, V.J. &
Z.J.,

              Plaintiffs,

   v.

AUDUBON BOARD OF EDUCATION,

           Defendant.

HON. JEROME B. SIMANDLE

Civil No. 06-5350 (JBS)

**OPINION**

APPEARANCES:

Jamie Epstein, Esq.
1101 Route 70 West
Cherry Hill, NJ 08002
    Attorney for Plaintiffs

James Schwerin, Esq.
Paul C. Kalac, Esq.
PARKER MCCAY, P.A.
1009 Lenox Drive
Suite 102A
Lawrenceville, NJ 08648
    Attorneys for Defendant Audubon Board of Education

**SIMANDLE**, District Judge:

In this action, Plaintiff L.J., individually and by his parents, V.J. and Z.J., filed a Complaint [Docket Item 1] and First Amended Complaint [Docket Item 4] against Defendant Audubon Board of Education ("Audubon") alleging a denial of his rights under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq.  In an earlier action on this dispute brought by Plaintiff on July 10, 2006 with the New Jersey Office of Special Education, Docket No. O.A.L. EDS 06203-2006S [Agency

Ref. No. 2007-11386], Plaintiff received a favorable final decision from Administrative Law Judge Joseph F. Martone issued on October 23, 2006 (the "ALJ Order").

Presently before the Court is Plaintiff's order to show cause requesting that the Court (1) issue a preliminary injunction ordering Defendant to comply with the ALJ Order, and (2) hold Defendant in contempt for its alleged failure to comply with the ALJ Order [Docket Item 5]. For the reasons discussed herein, which constitute this Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed. R. Civ. P., the Court will grant in part Plaintiff's motion for a preliminary injunction but will deny the remainder of the relief Plaintiff seeks.

I.   **BACKGROUND**

L.J. is an eight-year-old student in the Audubon Public School system. (Epstein Aff., ¶ 2; Pl.'s Suppl. Br. App. 1.) As a result of having been diagnosed with autism, L.J. receives special education and related services from Defendant's school district as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq. L.J.'s Individualized Education Program ("IEP")[1] lists numerous services

---

[1]   An IEP is "a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive." Jeremy H. v. Mount Lebanon School Dist., 95 F.3d 272, 275 n.4 (3d. Cir. 1996) (citation

that Defendant is required to provide L.J. in order to meet his educational needs, including speech and occupational therapy, school counseling, and Applied Behavioral Analysis ("ABA").[2] (Pl.'s Suppl. Br. App. 39.)

On July 10, 2006, L.J.'s parents, V.J. and Z.J., filed a due process petition pursuant to 20 U.S.C. § 1415(f) with the New Jersey Office of Special Education on behalf of their son, alleging that L.J.'s IEP for the 2005-2006 school year failed to address L.J.'s educational needs.  (Am. Compl. ¶ 8.)  The petition identified various shortcomings in L.J.'s IEP, including the IEP's failure to provide an effective behavior intervention plan to address the behaviors that were interfering with L.J.'s ability to learn; the absence of clear benchmarks, communication methodologies, and parental training strategies in the IEP; and Defendant's failure to employ qualified staff to provide L.J.

---

omitted).

[2]  As Judge Martone noted in his decision in this matter,

Applied Behavior Analysis is an educational method designed to increase through learning principles and methods behaviors that help children to learn and decrease behaviors that impede the ability to learn. While these techniques of learning are generally applicable to all children, they have been proven effective in the education of children on the autism/PDD spectrum who suffer from behavioral excesses or deficits that left uncorrected prevent learning.

Z.J. and V.J. v. Audubon Board of Education, No. EDS 6203-06, 2006 N.J. AGEN LEXIS 833, at *34 (N.J. Agen. 2006) (citation omitted).

3

with ABA-related services.  (Id.)  Hearings on the petition were held before Judge Martone on August 18 and 29, 2006. (Id. at ¶ 11.)

At the hearings before Judge Martone (the "ALJ hearings"), Plaintiff presented the testimony of Carolyn L. Breslyn and Brett DiNovi.  Z.J. and V.J. v. Audubon Board of Education, No. EDS 6203-06, 2006 N.J. AGEN LEXIS 833, at *5, *15 (N.J. Agen. 2006). Ms. Breslyn testified at the hearings that between June 2004 and March 2006, she worked for Audubon as a private autism consultant, and that during this time she was assigned to L.J. Id. at *7.  Ms. Breslyn testified to numerous failings in L.J.'s IEP for the 2005-06 academic year.  Id. at *11-13.  Specifically, Ms. Breslyn noted that while L.J.'s IEP identified educational goals, the plan failed to identify the personnel who were responsible for meeting those goals; the goals themselves were "neither measurable nor objective"; and the plan failed to provide a "methodology to be used to teach L.J. the goals and objectives."  Id. at *11.  Additionally, according to Ms. Breslyn, the IEP did not contain a behavior intervention plan ("BIP"), which is a means of identifying and responding to inappropriate behaviors that interfere with a child's ability to learn.  Id. at *12.

Ms. Breslyn also testified at length about a dispute she had with Patricia Porreca, Audubon's Director of Special Services,

about whether L.J. was receiving the hours of ABA-related services to which he was entitled.  According to Ms. Breslyn's testimony, L.J.'s IEP entitled him to receive fifteen hours of ABA-related services each week, with five of those hours provided at home by an aide and ten hours provided during school.  Id. at *8.  In spite of these requirements in the IEP, Ms. Breslyn testified that L.J. did not receive the five hours of home-based ABA-related services to which he was entitled, and that "the ABA services in the school were only provided sporadically."  Id.  In discussing Audubon's failure to provide L.J. with the ABA-related services to which he was entitled, Ms. Breslyn noted in particular that the district relied upon L.J.'s teacher, Beth Crosby, to provide L.J. with ABA-related services, but according to Ms. Breslyn, Ms. Crosby was unqualified to provide such services and failed to attend sessions at which she would have received ABA training.  Id. at *7-8.  The result, according to Ms. Breslyn, was that L.J. did not receive the hours of ABA-related services his IEP called for.

     At the ALJ hearings, the plaintiff also presented the testimony of Brett DiNovi, a board-certified behavior analyst.  Id. at *15-16.  Mr. DiNovi testified that the absence of a BIP in L.J.'s IEP undermined the IEP because L.J.'s inappropriate behaviors could not be addressed effectively.  Id. at *16-17.  Mr. DiNovi testified to the importance of methodological

consistency in crafting an IEP and criticized L.J.'s IEP for its methodological inconsistency and its failure to provide objective, measurable goals.  Id. at *18-19.

In his decision issued on October 23, 2006, Judge Martone found the testimony of Ms. Breslyn and Mr. DiNovi credible and determined, in effect, that Audubon had failed to provide sufficient ABA-related services to L.J. and that the 2005-06 IEP lacked "clear benchmarks" and methodologies.  In light of these findings, Judge Martone issued a four-part order that responded to the identified failings in L.J.'s 2005-06 IEP:

> 1. The petitioners' request that the previously identified interfering behaviors be adequately addressed by a positive behavioral plan shall be required. Based on the testimony of Mr. DiNovi, a qualified behavior specialist shall monitor and adjust the plan.
>
> 2. L.J. shall be provided with the sessions of behavior programming he lost during the 2005-06 school year to be provided by qualified personnel at respondent's expense and this compensatory education be completed within one year.
>
> 3. At a minimum, the level of ABA-related services of 15 hours per week as established in the 2005-06 IEP shall be strictly complied by the school district. If any sessions are missed by therapists because of absences or any other reason, they shall be made up on an immediate basis by the school district at its own expense.
>
> 4. The IEP shall be revised to set forth goals providing clear benchmarks with related instructional materials and methodologies, and the revised IEP shall include provisions for ongoing parental training to generalize interventions and programs.

Id. at *42-43.  Judge Martone designated his decision as final pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.510. Id. at *43.

According to the plaintiff, Audubon has failed to comply with the terms of the ALJ Order.  (Epstein Aff. ¶ 10.)  Plaintiff filed a complaint with this Court on November 8, 2006, and an amended complaint on November 17, 2006, requesting that the Court award attorney fees to Plaintiff's counsel pursuant to 20 U.S.C. § 1415(i)(3)(B).  (Compl. ¶¶ 16-18; Am. Compl. ¶¶ 16-18.)  On November 24, 2006, Plaintiff moved for an order to show cause asking the Court (1) to issue a preliminary injunction ordering Defendant to comply with the terms of the ALJ Order, and (2) to hold Defendant in contempt of the ALJ Order.  (Pl.'s Mot. 1-2.) On December 8, 2006, after Defendant failed to file a response to Plaintiff's complaint, the Clerk of the Court entered default against Defendant at Plaintiff's request.  Defendant subsequently moved to dismiss the matter, arguing that this Court lacked subject matter jurisdiction to entertain Plaintiff's complaint [Docket Item 10].  In its Opinion and Order of December 22, 2006 (the "December 22 Opinion and Order") [Docket Items 15 and 16], the Court denied Defendant's motion to dismiss, holding, under the reasoning of Jeremy H. v. Mount Lebanon School Dist., 95 F.3d 272, 278-279 (3d Cir. 1996), that its jurisdiction to enforce the ALJ Order lies under 42 U.S.C. § 1983.  The Court also declined

to remand the matter back to Judge Martone for clarification of
his order, instead calling upon Plaintiff "to develop the record
in this Court so that a clear command of the ALJ Order emerges"
[Docket Item 15].  Plaintiff subsequently responded by filing a
supplemental brief discussing the requirements of the ALJ Order
[Docket Item 17].

## II.  DISCUSSION

### A.    Plaintiff's Motion for a Preliminary Injunction

In order to obtain a preliminary injunction, the moving
party must establish that "(1) it has a likelihood of success on
the merits, (2) it will suffer irreparable harm if the injunction
is denied, (3) granting preliminary relief will not result in
even greater harm to the nonmoving party, and (4) the public
interest favors such relief."  Rogers v. Corbett, 468 F.3d 188,
192 (3d Cir. 2006) (internal quotations and citations omitted).
As the Court of Appeals for the Third Circuit has noted,
"[p]reliminary injunctive relief is an extraordinary remedy and
should be granted only in limited circumstances."  Kos
Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir.
2004) (internal quotations and citations omitted).

### 1.    Likelihood of Success

The Court first addresses the likelihood that Plaintiff will
succeed on the merits of his claim.  Under the IDEA, states that
accept federal funding for the education of disabled children

must provide children with disabilities "a free appropriate public education."  20 U.S.C. § 1415(a).  The IDEA "provides a procedure that allows disabled children and their parents to enforce this guarantee," Jeremy H., 95 F.3d at 278, by filing a request for an impartial due process hearing before the state education agency.  20 U.S.C. § 1415(f).  Although the IDEA provides for the right of a party "aggrieved" by the outcome of the administrative hearing to bring an action in "any State court of competent jurisdiction or in a district court of the United States," the statute does not expressly provide a means for children and parents who prevail at the administrative hearing to enforce the favorable administrative decision in state or federal court.  20 U.S.C. § 1415(i)(2)(A).  However, as this Court noted in its December 22 Opinion, the Court of Appeals for the Third Circuit held in Jeremy H. that "whether or not an IDEA decision of a state hearing officer or appellate body is enforceable under IDEA directly, such a decision would seem to be enforceable under section 1983." Jeremy H., 95 F.3d at 279; see also Robinson v. Pinderhughes, 810 F.2d 1270 (4th Cir. 1987).

This Court thus has jurisdiction to enforce the ALJ Order, and the critical issue regarding Plaintiff's likelihood of success in its enforcement action is whether Audubon has complied with the terms of that Order.  According to the plaintiff's allegations, Audubon has failed to comply with all four elements

of the ALJ Order.  (Pl.'s Supp. Br. 7-14.)  The defendant

disputes each of these allegations of noncompliance.  (Porreca

Aff. ¶¶ 14-17.)  The Court accordingly turns to each of the four

paragraphs of the ALJ Order to determine whether Plaintiff is

likely to succeed in proving Defendant's noncompliance.[3]

    a.    **The Behavior Plan Order**

    With regard to the first paragraph of the ALJ Order,

Plaintiff argues that Judge Martone's requirement that

"previously identified interfering behaviors be adequately

addressed by a positive behavioral plan" (the "Behavior Plan

Order"), Z.J. and V.J., 2006 NJ AGEN LEXIS 833, at *42, required

Defendant to conduct a "functional behavioral assessment" ("FBA")

in order to create the behavioral plan.  (Pl.'s Supp. Br. 8.)

While the Behavior Plan Order itself does not use the term

"functional behavioral assessment," Plaintiff argues that the

ALJ's findings, on which the Order was based, make clear that an

effective behavioral plan must be based on an FBA.  (Id.)

_____

    [3]  On September 11, 2007, Defendant moved for summary
judgment on its counterclaim, arguing that the Court should
reverse Judge Martone's ruling because he precluded Defendant
from submitting evidence at the hearings before him [Docket Item
32].  On October 16, 2007, the Court dismissed Defendant's motion
without prejudice to renewal on account of Defendant's failure to
file with the Court the administrative record from the ALJ
Hearings, as is required by 20 U.S.C. § 1415(i)(2)(C)(i) [Docket
Item 39].  Without the administrative record, of course, the
Court is unable to account meaningfully for the possibility of
reversing the ALJ Order in weighing Plaintiff's likelihood of
success on the merits.

According to Plaintiff, Defendant has failed to conduct an FBA, which would require Defendant to collect data on L.J.'s interfering behavior, establish techniques to discourage such behavior and to reinforce positive behavior, and train school staff and L.J.'s parents on the implementation of the behavioral plan.  (Id.)  In failing to conduct an FBA, Plaintiff argues, Audubon has failed to comply with Judge Martone's Behavior Plan Order.

Defendant argues that it has complied with the express requirements of the Order because it has had a behavior intervention plan in place since July 5, 2006.  (Porreca Aff. ¶ 14.)  According to Defendant, the text of the Behavior Plan Order requires only a "positive behavioral plan," not an FBA, and, as a matter of practice, behavior intervention plans are not typically based on FBAs, because FBAs are conducted only after a student has exhibited a persistent lack of progress.  (Id.)  While it has not conducted an FBA, Defendant argues that it has complied with the Order by implementing a behavior plan that has been monitored by board-certified behavior analysts and by collecting data on L.J.'s behavior.  (Id.)

The Court finds that, although the text of the Behavior Plan Order does not expressly require Audubon to conduct an FBA, the ALJ's findings indicate that the behavioral plan contemplated in the Order must incorporate an FBA.  In his discussion of whether

11

L.J.'s IEP provided an appropriate behavior intervention plan, ALJ Martone found credible Mr. DiNovi's testimony that "a behavior plan based on a functional behavioral assessment must be developed in order to design a motivational system of behavior to extinguish inappropriate behaviors, and to establish appropriate methods of dealing with those behaviors in order to allow L.J. the ability to progress academically." Z.J. and V.J., 2006 NJ AGEN LEXIS 833, at *32-33.  It would be inappropriate to read Judge Martone's Order in a manner that contradicts the findings underlying that Order, and, as such, the Order necessarily includes a requirement that Audubon conduct an FBA.  To comply with this section of the ALJ's decision, the Court finds that Audubon was required to conduct an FBA in a manner consistent with Mr. DiNovi's testimony on this issue.  See Id. at *19-20.

There is some evidence in the record suggesting that Audubon has complied in part with these requirements.  For example, Ms. Porreca states in her affidavit that Audubon has implemented a behavior implementation plan overseen by qualified personnel and has compiled data on L.J.'s behavior.  (Porreca Aff. ¶ 14.) Critically, however, the defendant concedes that it has not conducted an FBA because it disputes the appropriateness of performing such an assessment.  (Id.)  The question before this Court is not the wisdom of the ALJ's order, but whether Audubon has complied with its requirements.  In light of Defendant's

12

concession that it has not conducted an FBA, the Court finds that Plaintiff is likely to succeed in proving Audubon's noncompliance with the Behavior Plan Order.

**b.    The Compensatory Education Order**

Plaintiff alleges that Defendant has likewise failed to comply with the second element of the ALJ Order, which required Audubon to provide L.J. with "the sessions of behavior programming he lost during the 2005-2006 school year to be provided by qualified personnel at [Audubon's] expense and this compensatory education be completed within one year" (the "Compensatory Education Order"). Z.J. and V.J., 2006 NJ AGEN LEXIS 833, at *42-43. Defendant does not argue that it has complied with the Compensatory Education Order, but instead explains that it does not understand what ALJ Martone meant when referring to "lost" sessions. (Porreca Aff. ¶ 15.) In Defendant's words, it "cannot implement what it cannot understand." (Id.)

Although the Court agrees with Defendant that the ALJ Order is not clear on the issue of compensatory education, its requirements are not inscrutable. The ALJ found credible the testimony of Ms. Breslyn, who testified that Audubon failed to provide L.J. with the fifteen hours of ABA-related services to which he was entitled each week. Z.J. and V.J., 2006 NJ AGEN LEXIS 833, at *8. Specifically, Ms. Breslyn testified that she

13

recommended to Ms. Porreca that L.J.'s aide provide the five
hours of home-based ABA-related services to which L.J. was
entitled each week, but, according to Ms. Breslyn, "[t]his was
not followed by the school." Id.  In addition, Ms. Breslyn
testified that the remaining ten weekly hours of ABA-related
services called for in L.J.'s IEP "were only provided
sporadically." Id.  According to Ms. Breslyn, Audubon's failure
to provide ABA-related services in school was in part tied to the
fact that the personnel Audubon relied upon to provide such
services, including the classroom teacher and the one-on-one
aide, were not properly trained. Id. at *36-37.  Judge Martone
thus found that the fifteen weekly hours of ABA-related services
called for in L.J.'s IEP had been "lost" and ordered Audubon to
provide fifteen weekly hours of compensatory ABA-related services
to make up for the identified failings. Id. at * 42-43.

Audubon does not claim that it has attempted to provide
these "lost" hours, arguing only that the Compensatory Education
Order is too vague to be implemented. (Porreca Aff. ¶ 15.)  The
Court disagrees.  Having assessed the requirements of the Order,
and the ALJ's underlying findings, and in view of Audubon's
acknowledged noncompliance, the Court finds that Plaintiff is
likely to succeed in proving that Audubon has not complied with
the second requirement of the ALJ Order.

     **c.**    **The Service Provision Order**

14

Plaintiff alleges that Audubon has also failed to comply with the third paragraph of the ALJ Order, which requires that "[a]t minimum, the level of ABA related services of 15 hours per week as established in the 2005-2006 IEP shall be strictly complied [with] by the school district" and that "[i]f any sessions are missed by therapists because of absences or an other reason, they shall be made up on an immediate basis by the school district at its own expense" (the "Service Provision Order"). Z.J. and V.J., 2006 NJ AGEN LEXIS 833, at *43.  According to Plaintiff, Defendant has failed to document the hours of ABA-related services it has been providing L.J. and, as such, "there is no way of ascertaining whether this provision is being carried out."  (Pl.'s Supp. Br. 12.)

Audubon disputes these allegations and argues that it has complied with the Service Provision Order.  Ms. Porreca states in her affidavit that Audubon has provided ABA-related services, including "small group instruction, individualized instruction and drills, behavioral programming, [and] teacher, parent and student consultation" during the 2006-2007 school year.  (Porreca Aff. ¶ 16.)  Ms. Porreca further notes that "to comply with the ALJ's order, minutes of individualized instruction have been logged daily," and that, since the issuance of the Order, L.J.'s "individual minutes, along with small group instruction, behavioral programming, and consultation services currently

15

exceed the 15 hours as set forth in the ALJ's written decision."
(Id.)

The Court finds that Plaintiff has not shown that he is
likely to succeed in proving Defendant's noncompliance with the
Service Provision Order.  Indeed, Plaintiff's argument does not
even appear to allege that Audubon has failed to provide the
services in question, but instead suggests that it is Audubon's
burden to prove that the services are in fact being provided.  In
view of the detailed explanation of Audubon's compliance with the
Service Provision Order in Ms. Porreca's affidavit, the Court
finds that Plaintiff has failed to establish a reasonable
probability of eventual success in proving Audubon's
noncompliance on this issue.

d.   **The IEP Order**

Plaintiff finally alleges that Defendant has failed to
comply with the fourth paragraph of the ALJ Order, which states
that "[t]he IEP shall be revised to set forth goals providing
clear benchmarks with related instructional materials and
methodologies, and the revised IEP shall include provisions for
ongoing parental training to generalize interventions and
programs" (the "IEP Order").  Z.J. and V.J., 2006 NJ AGEN LEXIS
833, at *43.  According to Plaintiff, ALJ Martone found that
L.J.'s 2005-2006 IEP failed to comply with IDEA requirements, in
that it failed to set measurable goals or designate parties

16

responsible for their implementation.  (Pl.'s Supp. Br. 12.)
Plaintiff alleges that the 2006-2007 IEP suffers from similar
deficiencies, and thus evidences Audubon's noncompliance with the
IEP Order.  (Id. at 14.)  Specifically, Plaintiff alleges that
the 2006-2007 IEP does not specify a training methodology, fails
to tailor success criteria to L.J.'s particular needs, fails to
designate the parties responsible for implementation, and sets
non-observable goals that inhibit the capacity to measure L.J.'s
progress.  (Id.)  Plaintiff also contends that the 2006-2007 IEP
fails to provide for parental training to "generalize"[4] the ABA-
related work done during school hours, further demonstrating
Defendant's noncompliance with the IEP Order.  (Id. at 15.)

     Defendant contests these allegations of noncompliance.
Audubon first notes that since Judge Martone issued his order, it
has invited L.J.'s parents to two meetings to review and revise
L.J.'s IEP.  (Porreca Aff. ¶ 17.)  Ms. Porreca states in her
affidavit that L.J.'s parents attended the first of these
meetings on November 21, 2006, "but refused to review or revise
the IEP goals at this time," and that the parents failed to
attend the second meeting on December 7, 2006.  (Id.)  Faced with
the parents' unwillingness to cooperate, Ms. Porreca states that

---

     [4] "Generalization" in this context refers to the process of
reinforcing what the child learns in the tightly structured
therapeutic environment in less structured settings, such as the
home.  See Z.J. and V.J., 2006 NJ AGEN LEXIS 833, at *34-35.

Audubon "could not afford to wait any longer to develop" L.J.'s IEP, and, accordingly, drafted a new IEP with "[c]larified goals . . . [that] are being implemented." (Id.)  Additionally, Ms. Porreca states that L.J.'s 2006-2007 IEP provides for a parent clinic in order to "provide and review successful interventions that can be generalized in other settings." (Id.)

Having examined L.J.'s 2006-2007 IEP, the Court generally disagrees with Plaintiff that Audubon has failed to comply with the IEP Order.  The Court is unpersuaded by Plaintiff's argument that the new IEP fails to "state the methodology to be used to train L.J," in that the IEP itself belies this claim.  (Pl.'s Supp. Br. 14.)  For instance, in the section of the IEP that lists L.J.'s academic goals, numerous evaluation criteria are provided, with each objective listing a corresponding evaluation procedure.[5]  (Pl.'s Supp. Br. App. 3.)  The IEP also explains a methodology for training interfering behavior out of L.J. in its section on behavior interventions.  (Id.)  In addressing the target behavior of hand-bending and biting, for example, the IEP lists a clear method that school personnel should use to respond:

_____

[5]  For example, under L.J.'s "Reading/Language Arts" goals, the objective that L.J. "will independently type 15 letters of the alphabet with a visual cue" is evaluated by a "percent of trials data" methodology, with 80% success as the goal.  (Pl.'s Supp. Br. App. 3.)  As another example, under L.J.'s "Health, Safety, and Self-Help" goals, L.J.'s ability to "place a shoehorn and slide his foot into his shoe" is evaluated by a "# of prompts" methodology, with the goal being that L.J. performs the task "with 1 prompt."  (Id.)

1.  When hand bending/biting is self-stimulatory it
will be ignored and [L.J.] will be re-directed to the
activity he was originally completing.

2.  When the hand-bending/biting is in response to a
demand, [L.J.] will be instructed verbally to "Do this"
(with a demonstration of hands on lap) repeatedly,
until he complies.  He will then be redirected back to
the original demand.

(Id.)  This evidence of training methodologies in the 2006-2007
IEP do not exhibit the noncompliance with the ALJ Order that
Plaintiff alleges.

Moreover, the occupational and speech therapy goals and
objectives in the 2006-2007 IEP do not appear to "preclud[e]
measurability of any progress," as Plaintiff alleges.  (Pl.'s
Supp. Br. 14.)  The goals in L.J.'s speech therapy program, such
as "accept No for an answer and go on to other activities" and
"volunteer social greetings without prompting" are not so self-
evidently vague as to make measurability impossible.  (Pl.'s
Supp. Br. App. 3.)  Furthermore, the fact that the speech therapy
program uses L.J.'s success rate for each goal in order to
evaluate his mastery of the objectives indicates that Audubon
intends to measure L.J.'s progress.  (Id.)

Moreover, the record does not indicate that Plaintiff is
likely to succeed in showing Defendant's noncompliance with the
IEP Order's requirement that Audubon provide "ongoing parental
training to generalize interventions and programs."  Z.J. and
V.J., 2006 NJ AGEN LEXIS 833, at *43.  Ms. Porreca describes the

19

parental training and consultation that is provided in L.J.'s
2006-2007 IEP as follows:

> [T]he 2006-2007 IEP provides for a parent clinic with
> L.J.'s team of educators, paraprofessionals, and
> related service personnel 1x/month to review current
> programming, address parental concerns, and provide and
> review successful interventions that can be generalized
> in other settings.  Moreover, parent consultation is
> offered 1x/week to address parent concerns and present
> data review on how L.J. is performing in his
> educational program on a weekly basis.

(Porreca Aff. ¶ 17.)  There is nothing in the record at this
stage to suggest that the clinic and parental consultation
provide inadequate training.  The Court is particularly
disinclined to enjoin Audubon to provide a more robust parental
training program in light of the refusal of L.J.'s parents to
participate in drafting L.J.'s 2006-2007 IEP in the first place.

The Court does agree with Plaintiff that the 2006-2007 IEP
fails to designate parties responsible for implementing the
program's various components.  To that limited extent, therefore,
the Court finds the new IEP to be noncompliant with the IEP
Order.  Apart from the IEP's failure to identify responsible
school personnel, which is an easily-remedied oversight by
Defendant, the Court finds that the 2006-2007 IEP complies with
the substance of Judge Martone's IEP Order.

### 2.  Irreparable Harm

In order for a court to issue a preliminary injunction, "a
plaintiff must demonstrate potential harm which cannot be

redressed by a legal or an equitable remedy following a trial." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotations and citations omitted).  To justify the issuance of such an "extraordinary remedy," Kos Pharmaceuticals, 369 F.3d at 708 (citation omitted), the moving party must establish that more than "money, time and energy" is at stake in order for the harm to be considered irreparable.  Sampson v. Murray, 415 U.S. 61, 90 (1974).

There can be no doubt that the potential injury Plaintiff has alleged constitutes irreparable harm.  Judge Martone found that Audubon had fallen short of its obligations to provide L.J. with a "free appropriate public education," 20 U.S.C. § 1415(a), because L.J.'s 2005-2006 IEP failed to meet his educational and developmental needs.  The continuing denial of the educational services to which L.J. is entitled cannot be adequately redressed post-trial because "at the rate at which a child develops and changes . . . a few months can make a world of difference in harm to a child's educational development."  Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 121-22 (1st Cir. 2003) (internal quotations and citations omitted).  Taking into account the ALJ's findings regarding the inadequacy of the education Audubon was providing L.J., the Court finds sufficient evidence to show that L.J. will suffer irreparable harm in the absence of an injunction.

   3.  **Harm to the Nonmoving Party**

The Court finds that any harm Audubon would experience as a result of complying with the ALJ Order is outweighed by the injury that L.J. would suffer in the absence of an IEP that comports with Judge Martone's requirements.  Audubon has not indicated to the Court that it would suffer any injury by complying with the ALJ Order; it has alleged instead that it is generally in compliance and any noncompliance is attributable to its inability to interpret the Order.  (Porreca Aff. ¶ 15.) Moreover, Ms. Porreca recognizes in her affidavit that Audubon has an interest in furthering "the best educational interests of L.J."  (Id.)  In other words, the interests of L.J. and Audubon are not antagonistic.  Judge Martone determined that L.J.'s educational interests would be best served by following the requirements of his four-part Order.  Accordingly, in light of all parties' recognition of the primacy of L.J.'s educational needs and in the absence of any suggestion that compliance with the ALJ Order would harm Audubon, the Court finds that the balance of hardships weighs in favor of issuing an injunction.

**4.  Public Interest**

As the Court of Appeals for the Third Circuit has noted, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."  American Tel. and Tel. Co. v. Winback and

22

<u>Conserve, Inc.</u>, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).  It is undeniably in the public interest for providers of public education to comply with the requirements set out in the IDEA, and if administrative decisions in IDEA cases were unenforceable except after protracted litigation, then a child's right to "a free appropriate public education" would amount to very little indeed.  20 U.S.C. § 1415(a).  The Court therefore finds that it is in the public interest to enforce the ALJ Order in this case to the extent that Audubon's probable non-compliance has been found, above.

    **5.  Summary of Preliminary Injunction Findings**

    Having assessed the record regarding Audubon's compliance with the ALJ Order, the Court finds that Plaintiff is likely to prove that Audubon has not complied with the Behavior Plan Order, to the extent that it failed to conduct an FBA, and will enjoin Audubon to conduct an FBA and incorporate it into L.J.'s IEP. The Court further finds that Plaintiff has shown that Audubon has not complied with the Compensatory Education Order, since it has failed to provide the fifteen weekly hours of compensatory ABA-related services that Judge Martone called for, and the Court accordingly will order Audubon to provide such services. Additionally, the Court finds that L.J.'s IEP does not identify the school personnel responsible for implementing the program's various components, and directs Audubon to make appropriate

designations within the IEP so as to conform with Judge Martone's
Order.  The Court finds that Plaintiff has failed to establish
his likelihood of proving the remainder of his allegations of
noncompliance, and as to those, Plaintiff's motion for
preliminary injunctive relief will be denied.

   **B.   Contempt**

   Plaintiff has moved that the Court hold Audubon in contempt
for its alleged noncompliance with the ALJ Order.  (Pl.'s Br. 7.)
Plaintiff argues that Audubon's conduct following the issuance of
the ALJ Order amounts to contempt because Judge Martone's
decision constituted a valid court order of which Audubon had
knowledge and Audubon nonetheless failed to comply with that
order's terms.  (Id. at 8.)  Plaintiff further argues that
because willfulness is not necessary to a finding of contempt,
any good faith effort on Audubon's part to comply with the ALJ
Order is irrelevant if it ultimately failed to comply.  (Id.)

   **1.   Lack of Authority to Entertain Contempt of Another
         Forum's Order**

   The Court will deny Plaintiff's motion to hold Defendant in
contempt.  First and most critically, the Court notes that it
does not have the authority to hold a party in contempt of
another tribunal's orders, because "[c]ontempt proceedings,
whether civil or criminal, must be brought in the court that was
allegedly defied by a contumacious act."  Fed. R. Civ. P. 4.1,

Notes of Advisory Committee; see also International Union, UMWA v. Bagwell, 512 U.S. 821, 829 (1994) ("civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct"); Gray v. Petoseed Co., Inc., 985 F. Supp. 625, 631-32 n.6 (D.S.C. 1996) (citing additional cases).  Accordingly, the inherent authority of this Court to redress violations of its own orders through civil contempt does not extend to violations of orders of an Administrative Law Judge entered in a different forum.

### 2.    Lack or Merit of Contempt Motion

Even assuming the Court had the authority to hold Audubon in contempt of Judge Martone's order, however, it would not do so in this case.  "To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order."  John T. ex rel. Paul T. v. Delaware County Intermediate Unit, 318 F.3d 545, 552 (3d Cir. 2003) (citation omitted).  These three elements must be proven by clear and convincing evidence, a "high evidentiary standard," and any "ambiguities must be resolved in favor of the party charged with contempt."  Id.  (internal quotations omitted); see also Robin Woods Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994) ("where there is ground to doubt the wrongfulness of the conduct, [the alleged contemnor] should not

be adjudged in contempt"). Although "[w]illfulness is not a
necessary element of civil contempt," John T., 318 F.3d at 552
(citation omitted), "[c]ontemnors . . . are sometimes excused
when they violate vague court orders." Robin Woods, 28 F.3d at
399. This is because of the "longstanding salutary rule in
contempt cases that ambiguities and omissions in orders redound
to the benefit of the person charged with the contempt." Id.
(citation omitted).

In this case, it is evident, and indeed Audubon admits, that
a valid order existed, that Audubon knew of the order, and that
it has not entirely complied with the order. (Porreca Aff. ¶
15.) Nonetheless, Audubon has argued, and the Court agrees, that
the provisions of the order with which Audubon has failed to
comply are not unambiguously clear from Judge Martone's decision.
Audubon sought clarification from Judge Martone, which was
denied. Audubon argues that it complied with the Behavior Plan
Order because it instituted a behavior intervention plan, but
that it was not required to conduct an FBA because Judge
Martone's final Order made no express reference to an FBA. See
Z.J. and V.J., 2006 NJ AGEN LEXIS 833, at *42 ("The petitioners'
request that the previously identified interfering behaviors be
adequately addressed by a positive behavioral plan shall be
required. Based on the testimony of Mr. DiNovi, a qualified
behavior specialist shall monitor and adjust the plan.").

Although, as detailed supra, the Court disagrees with Audubon's interpretation of the Behavior Plan Order, it is clear that the Order does not expressly direct Audubon to conduct an FBA. Likewise, while the Court is confident that it has correctly interpreted the Compensatory Education Order, Audubon's admission that it was "confused as to [the Order's] meaning" and its allegation that, when asked, L.J.'s parents "had no explanation" as to the requirements of the Order suggest that those requirements were not unambiguously clear.  (Porreca Aff. ¶ 15.)

Moreover, the Court's examination of L.J.'s 2006-2007 IEP reveals that Audubon has largely complied with those provisions of the ALJ Order that are not ambiguous.  Audubon's compliance with the Order's straightforward requirements provides further support for the likelihood that its noncompliance with the more ambiguous requirements is more attributable to the Order's vagueness than to wrongfulness on Audubon's part.  In view of the fact that "ambiguities and omissions in orders redound to the benefit of the person charged with the contempt," Robin Woods, 28 F.3d at 399 (citation omitted), Plaintiffs have failed to prove, by clear and convincing evidence, that Defendant has acted in contempt of Judge Martone's decision.

Moreover, since civil contempt is an equitable remedy, the efforts of the movant to secure the alleged contemnor's compliance with the order must also be weighed; indeed, a

movant's unclean hands can be a basis for denying the remedy of civil contempt.  See Trustees of the Buffalo Laborers' Pension Fund v. Accent Stripe, No. 01-CV-76C, 2007 WL 1540267, slip op. at *5 (W.D.N.Y. May 24, 2007).  Here, the parents have failed to use reasonable efforts to formulate a mutually satisfactory, compliant IEP.  By failing to meaningfully participate in the first IEP meeting and refusing to even attend the follow-up IEP meeting for 2006-2007, as noted above, the parents left to the school officials the matter of converting the ALJ's unclear directives into a concrete IEP.  The parents should not skip participation in the IEP formulation meetings and then urge the Court to impose the extraordinary remedy of contempt when the resulting IEP does not conform to their expectations, especially in a rather close case such as this one.

### 3.    Conclusions Regarding Contempt Motion

In conclusion, the Court holds that it lacks authority to impose a civil contempt remedy for violation of the order of an Administrative Law Judge.  Even if such authority existed, Plaintiffs have not established Defendant's contempt of the ALJ's Order in light of Plaintiffs' own failure to meaningfully participate in the formulation of the resulting IEP for 2006-2007, and the unclarity of the decidual terms of the ALJ's Order, and Defendant's compliance with terms that were not unclear.

**III. CONCLUSION**

For the reasons discussed above, the Court grants in part Plaintiff's motion for a preliminary injunction, and directs Defendant (1) to conduct an FBA and incorporate it into L.J.'s IEP, (2) to provide L.J. with the fifteen weekly hours of compensatory ABA-related services that the ALJ Order called for, and (3) to designate the school personnel responsible for implementing the IEP's components.  The Court denies the remainder of relief Plaintiff seeks, and denies Plaintiff's motion for contempt.

The accompanying Order will be entered.


**November 5, 2007**                    **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        United States District Judge

29