IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                               :
L.J., a minor, individually    :    HON. JEROME B. SIMANDLE
and by his Parents, V.J. &     :
Z.J.,                          :    Civil No. 06-5350 (JBS)
                               :
              Plaintiffs,      :
                               :         OPINION
       v.                      :
                               :
AUDUBON BOARD OF EDUCATION,    :
                               :
              Defendant.       :
                               :
```

APPEARANCES:

Jamie Epstein, Esq.
1101 Route 70 West
Cherry Hill, NJ 08002
      Attorney for Plaintiffs

James Schwerin, Esq.
Paul C. Kalac, Esq.
Frank P. Cavallo, Jr., Esq.
PARKER MCCAY, P.A.
1009 Lenox Drive
Suite 102A
Lawrenceville, NJ 08648
      Attorneys for Defendant

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

     This dispute arises out of Plaintiff L.J.'s allegations that

Defendant Audubon Board of Education ("Audubon" or the "Board")

failed to provide him a free and appropriate public education in

violation of the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400, et seq.  Plaintiffs received a

favorable final determination on their IDEA claim in an

administrative proceeding held before Administrative Law Judge Joseph F. Martone ("ALJ Martone"), to whom the matter was assigned by the New Jersey Office of Special Education ("NJOSE"), and filed suit before this Court seeking an award of attorney's fees and, subsequently, an order from this Court enjoining Audubon to comply with the terms of ALJ Martone's final order.

Presently before the Court are two motions: Audubon's motion for leave to file an untimely appeal of the Court's Order denying its motion for summary judgment on its counterclaim [Docket Item 95], and Plaintiffs' motion seeking an award of counsel fees and costs for their attorney, Jamie Epstein, Esq. [Docket Item 92]. For the reasons discussed below, the Court will deny Audubon's motion, and will grant Plaintiffs' motion for attorney's fees, although, as the Court explains in detail herein, the award of attorney's fees will be significantly adjusted in order to reflect a reasonable hourly rate for the services Mr. Epstein rendered and a reasonable quantum of hours that Mr. Epstein should have expended in litigating this case.

## II. BACKGROUND

### A. Administrative Proceedings

The underlying facts in this matter were summarized in detail in the Court's November 5, 2007 Opinion, see L.J. ex rel. V.J. v. Audubon Bd. of Educ., No. 06-5350, 2007 WL 3252240 (D.N.J. Nov. 5, 2007), and are reviewed herein only to the extent

2

necessary to resolve the motions presently under consideration. L.J., a student in the Audubon School System, has received special education and related services since he was diagnosed with autism.  Id. at *1.  On July 10, 2006, L.J.'s parents, V.J. and Z.J., filed a due process petition pursuant to 20 U.S.C. § 1415(f) with the NJOSE on behalf of their son, alleging that L.J.'s individualized education program ("IEP") for the 2005-2006 school year failed to address his educational needs.  (Am. Compl. ¶ 8.)  The petition identified various shortcomings in L.J.'s IEP, including the IEP's failure to provide an effective behavior intervention plan to address the behaviors that were interfering with L.J.'s ability to learn; the absence of clear benchmarks, communication methodologies, and parental training strategies in the IEP; and Defendant's failure to employ qualified staff to provide L.J. with particular educational services.  (Id.) Plaintiffs' due process petition was assigned to ALJ Martone. (Schwerin Aff. ¶ 3.)

ALJ Martone set a schedule for argument on Plaintiffs' due process petition, scheduling hearings for August 18 and 29, 2006. See Z.J. v. Audubon Bd. of Educ., No. 2007-11386, 2006 WL 3075735, at *1 (N.J. Adm. Oct. 23, 2006).  At the second of these hearings, on August 29, 2006, Plaintiffs

> raised an evidentiary objection to certain documents
> offered for identification by [Audubon] on the basis that
> [Audubon] had not provided any discovery pursuant to the
> requirements of N.J.A.C. 1:6A-10.1(a) and (b).  [The]

3

> [a]ttorney for [Audubon] did not dispute this,
> representing that he had made an unsuccessful attempt to
> provide discovery to the [Plaintiffs] but he acknowledged
> that such discovery had not been provided.

Id. Pursuant to N.J.A.C. 1:6A-10.1(c), which provides in
relevant part that "[u]pon application of a party, the judge
shall exclude any evidence at [a] hearing that has not been
disclosed to that party at least five business days before the
hearing," Plaintiffs moved to exclude from the administrative
proceedings the evidence that Audubon conceded it had failed to
disclose.  N.J.A.C. 1:6A-10.1(c) (emphasis added).

The ALJ addressed Plaintiffs' motion in an "order excluding
evidence pursuant to N.J.A.C 1:6A-10.1."  Z.J. v. Audubon Bd. of
Educ., No. 2007-11386, 2006 WL 3075736, at *1 (N.J. Adm. Oct. 23,
2006) (capitalization omitted).  The ALJ found that the lone
exception contained within N.J.A.C 1:6A-10.1(c) – for cases in
which "the evidence could not reasonably have been disclosed
[five days before the hearing]" – was inapplicable to the
proceedings before him, noting that "[t]here [was] no information
in the record . . . to support that determination in this
matter."  Z.J., 2006 WL 3075736, at *1.  In light of Audubon's
acknowledged failure to disclose evidence that was available for
disclosure in accordance with the five-day rule, the ALJ excluded
"any evidence that has not been[] disclosed by [Audubon] to the
[Plaintiffs] at least five business days before the hearing,
unless I determine that the evidence could not reasonably have

been disclosed within that time." Id. at *3.

After the August 18 and 29, 2006 hearings, and upon consideration of L.J.'s IEPs and the testimony of two witnesses for Plaintiffs, ALJ Martone determined in a decision issued on October 23, 2006 that L.J.'s 2005-2006 IEP failed to provide him with an appropriate education under the IDEA, and issued a four-part order calling upon Audubon to redress the failings in L.J.'s educational program. Z.J., 2006 WL 3075735, at *42-43. ALJ Martone designated his decision as final pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.510. Id. at *43.

### B. Proceedings Before this Court

Plaintiffs filed the Complaint in this action on November 8, 2006, seeking an award of attorney's fees for having prevailed at the administrative level [Docket Item 1]. Given how straightforward the underlying claims and issues were, the litigation that ensued over the following two years was unnecessarily protracted and contentious, owing in large part to the failure of Defendant to file its submissions on a timely basis and to comply with court orders, and to the unproductive acrimony displayed by counsel on both sides, as the following summary makes clear.

After Defendant failed to timely plead or otherwise defend, the Clerk of the Court entered default against Defendant upon Plaintiffs' request [Docket Item 9], which the Court set aside

5

pursuant to Defendant's motion in an August 22, 2007 Memorandum Opinion and Order [Docket Items 26 and 27].  In its Amended Answer, Defendant asserted a counterclaim against Plaintiffs, alleging that the matter should be remanded to the ALJ because the exclusion of Defendant's non-disclosed evidence was arbitrary and capricious.

Shortly after filing the Complaint, Plaintiffs moved for a preliminary injunction, arguing that Defendant had failed to comply with the ALJ's October 23, 2006 order and seeking a court order requiring Defendant to comply with the ALJ's order. Defendant opposed Plaintiffs' motion, arguing that this Court lacked jurisdiction to enforce the ALJ's order.  In its December 22, 2006 Opinion and Order [Docket Items 15 and 16], the Court addressed and rejected Defendant's jurisdictional objections, holding that, under <u>Jeremy H. v. Mount Lebanon School Dist.</u>, 95 F.3d 272, 278-279 (3d Cir. 1996), jurisdiction to enforce an IDEA administrative order with which a defendant has failed to comply lies under 42 U.S.C. § 1983.[1]  In a subsequent Opinion and Order

---

[1]  In <u>Jeremy H.</u>, the Court of Appeals, citing the decision of the Court of Appeals for the Fourth Circuit in <u>Robinson v. Pinderhughes</u>, 810 F.2d 1270 (4th Cir. 1987), held that the decision of an IDEA hearing officer with which a school board defendant had failed to comply is enforceable under 42 U.S.C. § 1983.  95 F.3d at 278-279 (explaining that "[w]e agree with the reasoning of <u>Pinderhughes</u> . . .").  More recently, in <u>A.W. v. Jersey City Public Schools</u>, the Court of Appeals held, without mentioning <u>Jeremy H.</u>, that "an action can [not] be maintained against school officials under 42 U.S.C. § 1983 for violations of

[Docket Items 41 and 42], the Court granted in part Plaintiffs'
motion for a preliminary injunction, finding that Audubon had
failed to comply with specific portions of the ALJ's order and
requiring that Audubon bring itself into compliance with ALJ
Martone's directives.

Shortly after the entry of the Court's injunctive Order,
Plaintiffs filed an order to show cause in which they argued that
Audubon had not timely complied with the Court's Order [Docket
Item 45]. In their motion, Plaintiffs, through Mr. Epstein,
urged the Court to order the incarceration of Don Borden,
Superintendent of the Board of Education, and the payment of
$10,000 per day of the Board's noncompliance, in order to compel
the Board's compliance. (Docket Item 45 at 2.) After convening
a telephone conference, at which it became clear that the parties
had made little to no meaningful effort to resolve the matter

---

the . . . IDEA." 486 F.3d 791, 792 (3d Cir. 2007) (en banc).
The A.W. decision cited extensively to a different Fourth Circuit
opinion, Sellers by Sellers v. School Bd. of City of Mannassas,
Va., 141 F.3d 524 (4th Cir. 1998), and explained that it found
"the reasoning of Sellers . . . convincing." A.W., 486 F.3d at
803. Sellers, in turn, makes clear that the Pinderhughes rule –
that a section 1983 enforcement action lies against a school
board which "failed to abide by a final administrative order" –
survived its holding that a section 1983 action cannot be
maintained against the board's officials. Sellers, 141 F.3d at
532 n.6. In light of the Third Circuit's express reliance upon
Sellers, and the Sellers court's explanation that the
Pinderhughes rule remains good law, A.W. does not appear to
overrule Jeremy H. That is, just as Pinderhughes survives
Sellers in the Fourth Circuit, Sellers, 141 F.3d at 532 n.6, so
too does Jeremy H. provide a limited exception to A.W. in this
Circuit.

before Mr. Epstein sought to have Mr. Borden incarcerated,[2] the
Court entered an Order requiring that "counsel and clients . . .
attend and participate in good faith in an effort to resolve this
dispute about the required and provided services so that no Court
intervention will be necessary."  (Docket Item 49 at 1.)  The
parties did not resolve the dispute, and the Court subsequently
adjudged Defendant to be in civil contempt and ordered Audubon to
cease its noncompliance [Docket Items 65 and 66].  Audubon
thereafter began providing L.J. with the educational services in
question.

    On September 11, 2007, Defendant moved for summary judgment
as to its counterclaim against Plaintiffs.  In a Letter Order
dated October 16, 2007 [Docket Item 39], the Court observed that
Defendant had failed to submit the record of the administrative
proceedings with its motion, as 20 U.S.C. § 1415(i)(2)(C)(i)[3]
requires.  Because the Court was unable to address the merits of
Defendant's motion in the absence of the administrative record,
see id., it dismissed the motion without prejudice to renewal

_____

    [2]  As frequently became the case in this litigation, the
December 5, 2007 conference call "provided an environment for . .
. [Mr. Epstein and his adversary, Mr. Schwerin] to continue the
contentious interpersonal dispute they began" prior to the filing
of the instant Complaint.  Sukenic v. Maricopa County, No.
02-2438, 2004 WL 3522693, at *14 (D. Ariz. July 21, 2004).

    [3]  20 U.S.C. § 1415(i)(2)(C)(i) provides that in an action
brought pursuant to § 1415(i)(2), the aggrieved party must file
with the Court "the records of the administrative proceedings."

upon Defendant's filing the administrative record with the Court
within twenty days.

Forty-two days after the entry of the October 16, 2007
Order, on November 27, 2007, Defendant filed part, but not all,
of the administrative record with the Court.  On February 20,
2008, Defendant renewed its motion for summary judgment on its
counterclaim [Docket Item 64], which Plaintiffs again opposed on
§ 1415(i)(2)(C)(i) grounds, noting that Defendant had still
failed to file with the Court the complete record of the
administrative proceedings.  Defendant objected to Plaintiffs'
opposition in a letter dated March 18, 2008, complaining that
Plaintiffs had employed a "hyper-technical reading of the
requirement of filing the administrative record" (Docket Item 76
at 1), but, finally, on April 2, 2008, Defendant filed the
complete record of the administrative proceedings with the
Court.[4]

---

[4]   After briefing on Defendant's motion for summary judgment
was completed, Mr. Schwerin, attorney for Defendant, wrote to
"request[] that Your Honor accept my personal apology to the
court for the delays in prosecuting the Motion for Summary
Judgment as set forth in your letter.  Those delays . . . were
purely my fault and not the fault of the Audubon Board of
Education . . ."  (Docket Item 80 at 1.)  In a submission that in
no way advanced the interests of his clients, Mr. Epstein filed
the following letter on the Docket:

> The following is in response to Mr. Schwerin's letter of
> today.  Although counsels' admission of negligence is to
> be admired for its candor, as a matter of law, it is not,
> in anyway [sic], a defense for damages caused by his
> client.  Counsels' duty to make his clients whole, for

In its September 10, 2008 Opinion and Order [Docket Items 89 and 90], the Court denied Audubon's motion for summary judgment as to its counterclaim seeking remand to the ALJ.  Unpersuaded by Audubon's argument that the ALJ had erred in applying N.J.A.C. 1:6A-10.1(c)'s "five-day rule" to exclude evidence that the Board had failed to timely disclose, the Court explained:

> The five-day rule furthers the goal of "prompt resolution of questions involving the education of handicapped children," [Spiegler v. District of Columbia, 866 F.2d 461, 467 (D.C. Cir. 1989) (quoting 121 Cong. Rec. 37,416 (1975))], by providing unambiguous requirements and strong incentives for pre-hearing disclosures. See Pachl ex rel. Pachl v. School Bd. of Independent School Dist. No. 11, No. 02-4065, 2005 WL 428587, at *18 (D. Minn. Feb. 23, 2005).  That is, the rule puts parties to IDEA administrative proceedings on notice as to precisely what must be disclosed ("any evidence at [a] hearing") and when ("at least five business days before the hearing"), and reduces the likelihood that a hearing would have to be delayed or adjourned on account of disputes or confusion over a party's disclosure obligations. N.J.A.C 1:6A-10.1(c).   Notwithstanding  Defendant's complaint about the ALJ's "hyper[-]technical" application of the five-day rule in this case, then, (Schwerin Aff. ¶ 5), it is precisely the categorical, unambiguous nature of the rule that serves "the IDEA's goal of prompt resolution of disputes  .  .  .  .  concerning  the  disabled  student's education."  [Dell v. Board of Educ., Tp. High School Dist. 113, 32 F.3d 1053, 1061 (7th Cir. 1994)].

---

counsel's malpractice, has no bearing on my clients or our lawsuit, but is solely a matter between counsel, his malpractice carrier (if any) and his client.

In closing, we question why contemptuous defendant, once again, wastes this Court's precious judicial resources with their continual distractions.

(Docket Item 81 at 1) (emphasis in original).  Mr. Epstein seeks to be awarded $120 in attorney's fees from Defendant for the time he spent drafting this letter.

(Docket Item 90 at 11-13, footnote omitted.)

In light of the fact that the Court had rendered a final denial of relief as to the Defendant's counterclaim, the Court noted that "the only matter remaining in this case is Plaintiffs' motion for attorney's fees," and afforded Plaintiffs twenty days to file their motion for attorney's fees, (id. at 14 n.7), a period that was later enlarged upon Plaintiffs' request [Docket Item 91].  Fifty-eight days after the entry of the Court's September 10, 2008 Opinion and Order, Audubon filed a motion seeking leave to file an untimely appeal of that Order [Docket Item 95].

After Mr. Epstein filed his application for attorney's fees and Defendant filed its opposition thereto, the Court, observing that the parties were in dispute as to Mr. Epstein's hourly rate and that Mr. Epstein had not submitted evidence sufficient to support his assertion that a reasonable hourly rate for his services was $400, entered an Order seeking supplementation of the record [Docket Item 96].  Specifically, the Order provided:

> Mr. Epstein [should] submit to the Court for in camera inspection copies of all billing statements from the last six months in which he has charged a fee-paying client at the rate of $400 per hour, and which the client has paid. If Mr. Epstein has no such records, he should submit copies of all billing statements in which he has charged fee-paying clients at a rate exceeding $250 per hour, which the client has paid, over the last six months.

(Docket Item 96 at 1.)  In his response to this Order, Plaintiff indicated that he had no records that meet any of these criteria.

11

In a subsequent Order, the Court solicited the parties'
input as to whether it should "convene an evidentiary hearing to
hear testimonial evidence as to the reasonable market rate" for
Mr. Epstein's services.  (Docket Item 103 at 1.)  Both parties
indicated that the record was sufficient for the Court's
determination without the need for an evidentiary hearing.[5]

## III. DISCUSSION

### A.   Defendant's Motion for Leave to File an Untimely Appeal

The Court first addresses Defendant's motion for leave to
file an untimely appeal of the Court's September 10, 2008 Order.
As the preceding summary of this case's history and the following
discussion make plain, the Board's litigation of this case has
been consistently undermined by its own repeated failure to
adhere to deadlines established by the New Jersey Office of
Administrative Law, by this Court's scheduling orders, and, now,
by the Federal Rules of Appellate Procedure.  For the reasons
that follow, the Court finds that the Board has not shown
"excusable neglect or good cause" for its failure to file a
timely appeal, Fed. R. App. P. 4(a)(5)(A)(ii), and the Board's
motion will accordingly be denied.

       1.   <u>Standard of Review</u>

Under the Federal Rules of Appellate Procedure, "[i]n a

---

[5]  Mr. Epstein seeks to be awarded $1,000 in attorney's fees
from Defendant for the 2.5 hours he spent responding to the
Court's question.  (Docket Item 104 at 2 n.5.)

civil case . . . , the notice of appeal required by Rule 3 must
be filed with the district clerk within 30 days after the
judgment or order appealed from is entered."[6]   Fed. R. App. P.
4(a)(1)(A).   Rule 4(a)(5)(A), Fed. R. App. P., provides:

>    (A) The district court may extend the time to file a
>    notice of appeal if:
>
>>        (i) a party so moves no later than 30 days after
>>        the time prescribed by this Rule 4(a) expires; and
>>
>>        (ii) regardless of whether its motion is filed
>>        before or during the 30 days after the time
>>        prescribed by this Rule 4(a) expires, that party
>>        shows excusable neglect or good cause.

Fed. R. App. P. 4(a)(5)(A).

In determining whether a party has shown excusable neglect
or good cause for its failure to file a timely appeal, the Court
applies the four-factor test set forth by the Supreme Court in
Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship., 507
U.S. 380, 395-97 (1993).   See In re Diet Drugs Product Liability
Litigation, 401 F.3d 143, 153-54 (3d Cir. 2005) (agreeing with
the conclusion of multiple circuits that Pioneer applies "in the
context of filing for appeal pursuant to Fed. R. App. P.
4(a)(5)").   The four Pioneer factors are: "[1] the danger of
prejudice to the [non-movant], [2] the length of the delay and
its potential impact on judicial proceedings, [3] the reason for
the delay, including whether it was within the reasonable control

_____

      [6]  Rule 4(a)(1) contains three exceptions to the thirty-day
period not applicable to the facts of this case.

of the movant, and [4] whether the movant acted in good faith."
Pioneer, 507 U.S. at 395.  The Court considers these factors in
turn below.

      2.  <u>Analysis</u>

Initially, the Court concludes that the motion presently
under consideration is not untimely under Rule 4(a)(5)(A)(i).
"[T]o obtain relief under Rule 4(a)(5), [a prospective appellant
is] . . . <u>required</u> to move for an extension of time no later than
30 days after the time for appeal expired." <u>Cummings v. Jackson</u>,
No. 07-4046, 2008 WL 5377782, at *5 (D.N.J. Dec. 18, 2008)
(citation omitted, emphasis added).  The Board seeks leave to
file a belated appeal from the Court's September 10, 2008 Order,
and it thus had to file the instant motion before November 9,
2008 – <u>i.e.</u>, thirty days after the thirty-day time to appeal
expired.  Because the instant motion was filed two days before
November 9, 2008, the Court has the authority to entertain it.
<u>See</u> <u>id.</u> (citing cases).

Turning to Rule 4(a)(5)(A)(ii), the Court concludes that
excusable neglect or good cause have not been shown here, because
none of the <u>Pioneer</u> factors weighs in favor of granting the
Board's motion.  As to the first factor, "the danger of prejudice
to the [non-movant]," <u>Pioneer</u>, 507 U.S. at 395, the Court finds
that the risk of prejudice to Plaintiffs, when viewed in the
context of this litigation as a whole, is substantial.  Put

simply, the Board has defaulted and delayed at every turn
throughout this litigation.  The Board first failed to comply
with the Office of Administrative Law's five-day discovery
production rule, which led to the exclusion of its evidence from
the administrative hearing pursuant to N.J.A.C. 1:6A-10.1(c).
After Plaintiff filed the Complaint before this Court, the Board
failed to file a timely answer, which led the clerk's entry of
default.  After the Court granted the Board's motion to set aside
the default, the Court, finding that the Board had failed to
comply with the ALJ's order, first enjoined the Board to induce
its compliance, and, upon the Board's sustained recalcitrance and
defiance of this Court's Order, adjudged the Board to be in civil
contempt.  After the Board failed to file the administrative
record in support of its motion for summary judgment on its
counterclaim, as 20 U.S.C. § 1415(i)(2)(C)(i) requires, the Court
afforded the Board twenty days to refile its summary judgment
motion with a complete administrative record.  The Board missed
this deadline by twenty-two days, only to refile its summary
judgment motion, again without the complete record of the
administrative proceedings.  The Board did not file the
statutorily mandated administrative record in support of its
summary judgment motion until April 2008, seventeen months after
Plaintiffs filed the Complaint herein.  Consistent with this
history, the Board missed its deadline to appeal from the Court's

September 10, 2008 Order by twenty-eight days, filing its motion for leave to file an untimely appeal just two days shy of Rule 4(a)(5)(A)(i)'s thirty-day cutoff, beyond which point the Court would have lacked the authority even to entertain a motion for leave to file a belated appeal due to sheer untimeliness.  See Fed. R. App. P. 4(a)(5)(A)(i).

In light of this protracted history of delay by Audubon, the Court finds that "the danger of prejudice to [Plaintiffs]," Pioneer, 507 U.S. at 395, risked by permitting the Board to take an untimely appeal is not, as the Board argues, insignificant. Whether by negligence or as a stalling tactic, the Board frustrated L.J.'s ability to obtain the benefits of the educational programming ordered by the ALJ, necessitating multiple enforcement orders from this Court.  Questions over the permanence of the relief Plaintiffs obtained at the administrative level were prolonged unnecessarily by the Board's repeated failures to file a proper summary judgment motion.  In view of the IDEA's goal of "encourag[ing] the prompt, rather than protracted, resolution of disputes concerning the disabled student's education," Dell v. Board of Educ., Tp. High School Dist. 113, 32 F.3d 1053, 1061 (7th Cir. 1994), and in light of the Board's repeated defaults and delays which have already prolonged this lawsuit well past the point when it should have been resolved, the Court concludes that Plaintiffs would be

prejudiced if the Board were permitted to file a belated appeal after the most recent of a long series of defaults.

For substantially similar reasons, the Court finds that considerations of "the length of the delay and its potential impact on judicial proceedings" do not weigh in Audubon's favor. <u>Pioneer</u>, 507 U.S. at 395.  Again, the Board's most recent failure to file a timely submission must be viewed in the context of the "judicial proceedings" as a whole, <u>id.</u>, which have been steadily prolonged as a result of the Board's repeated failure to comply with basic procedural rules and scheduling requirements.[7]  As to the impact on these judicial proceedings, the Court reiterates the observation from its September 10, 2008 Opinion:

> The matter which Defendant seeks to reargue before the ALJ is the appropriateness of L.J.'s IEP for the 2005-2006 academic year.  Although the ALJ rendered his decision in October 2006 and this lawsuit was commenced shortly thereafter, it was not until April 2008 – nearly eighteen months after the ALJ issued his decision – that Defendant was able to navigate the . . . requirements of 20 U.S.C. § 1415(i)(2)(C)(i) in order to file an appropriate motion for summary judgment on its

---

[7]  Moreover, the length of delay itself is not, as the Board implies, insignificant.  Federal Rule of Appellate Procedure 4(a)(5)(A)(i) requires that a request to file an untimely appeal be filed no later than thirty days after the deadline to file a timely appeal expired.  "The time requirements contained in Rule 4 derive from the need for finality of judgments and an end to litigation."  <u>Matter of GAC Corp.</u>, 640 F.2d 7, 8 (5th Cir. 1981).  Defendant's motion, filed twenty-eight days after the thirty-day period expired, is not untimely – that is, it at least can be entertained by this Court.  However, in light of Rule 4's thirty-day window, a twenty-eight-day delay is not insignificant; to the contrary, it is just two days shy of being irretrievably untimely.

> counterclaim.  (Docket Item 76.)  The notion of remanding
> this matter on account of the ALJ's straightforward
> application of an unambiguous rule in order to reconsider
> the adequacy of a three-year-old IEP is particularly
> inappropriate in light of the IDEA's emphasis on prompt
> dispute resolution.

(Docket Item 89 at 12-13 n.4.)  While it would have been the

Board's right to file a timely appeal, in view of the preceding

considerations, the Court cannot conclude that the "impact [of an

untimely appeal] on [the] judicial proceedings" weighs in

Defendant's favor.  Pioneer, 507 U.S. at 395.

   The Court next addresses the stated "reason for the delay,

including whether it was within the reasonable control of the

movant."  Id.  That reason appears in the Affidavit of Frank P.

Cavallo, Jr., Esq.:

> [T]his litigation is being funded by an insurance
> company, Ace USA.  For reasons unknown to the
> undersigned, and despite the fact that Ace was promptly
> notified of this court's decision and of the 30 day time
> limit for filing an appeal, no authorization to file an
> appeal was received from Ace USA until after the deadline
> had come and gone.  At this time, we have been authorized
> by the Superintendent of Schools and School Business
> Administrator to file this Notice of Motion and Appeal,
> notwithstanding the fact that Ace USA still has not
> authorized the filing of an appeal.

(Cavallo Aff. ¶ 5.)  Notably absent from this explanation is any

suggestion that the Board took any steps between "promptly

notif[ying]" its insurer of the time period for filing, (id.),

and the expiration of that period.  Mr. Cavallo's statement

refers to the inaction of the Board's insurer, but is silent as

to any efforts the Board took to encourage Ace USA to expedite

18

its decision.  Such efforts would undoubtedly have been "within the reasonable control of the movant."  <u>Pioneer</u>, 507 U.S. at 395. So, too, would it have been within Audubon's control to file a timely appeal, and, if its insurer ultimately elected not to fund further litigation, to voluntarily dismiss its appeal.[8]  The Court finds that the Board has not presented a satisfactory reason for its delay, and likewise finds that no shortage of opportunities to file a timely appeal were easily within "the reasonable control of the movant."  <u>Id.</u>

Finally, in light of the considerations reviewed above, the Court cannot conclude that the Board's failure to file a timely appeal is the product of Defendant having "acted in good faith." <u>Id.</u>  The sheer quantity of delays, defaults, missed deadlines, and failures to comply with court orders over the history of this litigation forecloses such a conclusion.  At best, Audubon's latest default is the product of a sustained pattern of carelessness, and it manifestly is not the product of the Board having acted in good faith.

With all four of the <u>Pioneer</u> factors weighing firmly against granting the Board's application for leave to file an untimely appeal, the Court finds that Audubon has failed to establish "excusable neglect or good cause" for failing to file a timely

---

[8]  Such a cautionary measure would have cost the Board no more than the $450 filing fee.  <u>See</u> 28 U.S.C. § 1913.

appeal.  Fed. R. App. P. 4(a)(5)(A)(ii).  "If there was 'excusable' neglect here, we have difficulty imagining a case of inexcusable neglect."  Prizevoits v. Ind. Bell Tel. Co., 76 F.3d 132, 134 (7th Cir. 1996).  The Court will thus deny Defendant's motion for leave to file an untimely appeal.

**B.    Motion for Attorney's Fees**

The Court next addresses Plaintiffs' motion for an award of attorney's fees for their attorney, Mr. Epstein.  The Court's analysis as to whether Plaintiffs are entitled to an award of reasonable attorney's fees is twofold.  First, the Court must address whether Plaintiffs prevailed in the proceedings at issue herein.  See P.G. v. Brick Tp. Bd. of Educ., 124 F. Supp. 2d 251, 259 (D.N.J. 2000).  If the Court finds that Plaintiffs were the prevailing parties in this action, then the Court must assess the reasonable fees and costs to which Mr. Epstein should be awarded. Id.  As the Court explains below, it finds that Plaintiffs prevailed in this litigation by securing injunctive relief that compelled the Board to cease its protracted noncompliance with the ALJ's final order.  See John T. ex rel. Paul T. v. Delaware County Intermediate Unit, 318 F.3d 545, 555 (3d Cir. 2003). However, the Court finds that the rate at which Mr. Epstein seeks to be compensated in this matter is not a reasonable hourly rate for his services, and that his records reflect excessive billing for a host of non-compensable matters, and will reduce the

20

requested fee award accordingly.[9]

      1.   Prevailing Party Status

     While "[u]nder the 'American Rule,' parties are typically responsible for their own attorneys' fees," P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 852 (3d Cir. 2006) (citation omitted), Congress has, in certain statutes, authorized an award of fees to a "prevailing party." See, e.g., 20 U.S.C. § 1415(i)(3)(B); 42 U.S.C. § 1988. As the Court of Appeals explained in John T.,

> [t]he Supreme Court has held that plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit. Accordingly, the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.

---

    [9] As an initial matter, the Court notes that this is not the first time that Mr. Epstein, "either through gross carelessness or worse," has sought counsel's fees well in excess of that to which he could reasonably have believed he was entitled. Deptford Tp. School Dist. v. H.B. ex rel E.B., 279 Fed. Appx. 122, 126 n.2 (3d Cir. 2008). In Deptford, the Court of Appeals held that Mr. Epstein was not entitled to an award of attorney's fees because his clients were not prevailing parties, but noted, additionally, that "fees should not have been awarded" because Mr. Epstein billed 60 hours in a single day. Id. The Court of Appeals cited Fair Housing Council of Greater Wash. v. Landow, wherein the Court of Appeals for the Fourth Circuit explained that a court may "deny a request for attorneys' fees in its entirety when the request, submitted pursuant to 42 U.S.C. § 1988, is so outrageously excessive it shocks the conscience of the court." 999 F.2d 92, 96 (4th Cir. 1993) (internal quotations and citations omitted). As the discussion below makes clear, Mr. Epstein's submission in this matter veers dangerously close to this line, and while the fee request is not denied outright, it is reduced substantially.

John T., 318 F.3d at 555 (internal quotations and citations omitted).

Moreover, as the Supreme Court held in Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources, a litigant cannot be a prevailing party for attorneys' fees purposes unless it has received court-ordered relief. 532 U.S. 598, 603-04 (2001) ("A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change."). Hence, a plaintiff who benefits from a settlement agreement with a defendant will not be considered a prevailing party unless "the change in the legal relationship of the parties was in some way judicially sanctioned." P.N., 442 F.3d at 853 (internal quotations and citations omitted). Additionally, "a claimant is not a prevailing party merely by virtue of having acquired a judicial pronouncement unaccompanied by judicial relief." Select Milk Producers, Inc. v. Johanns, 400 F.3d 939, 947 (D.C. Cir. 2005) (cited approvingly in People Against Police Violence v. City of Pittsburgh, 520 F.3d 226, 234 (3d Cir. 2008)).

Defendant does not appear to challenge Plaintiffs' status as prevailing parties, and the Court agrees that, both in the administrative proceedings and in the proceedings before this Court, Plaintiffs achieved a "material alteration of the legal

22

relationship of the parties in a manner which Congress sought to promote in the fee statute."[10]   John T., 318 F.3d at 555.   At the administrative level, Plaintiffs brought this action to challenge the adequacy of L.J.'s IEP, and, as a result of the prosecution of their administrative complaint, they obtained the four-part order from ALJ Martone, explained supra, which required Defendant to alter L.J.'s IEP and provide L.J. with compensatory educational programming.   By securing such judicially sanctioned relief, Plaintiffs prevailed at the administrative level.   See id.

Plaintiffs likewise were the prevailing parties in the proceedings before this Court.   While this federal Complaint was initially filed seeking only an award of attorney's fees, Plaintiffs were compelled, through the Board's sustained recalcitrance in failing to comply with ALJ Martone's order, to seek court-ordered relief through an order enjoining the Board to comply with the ALJ's order and a subsequent order adjudging the

---

[10]   The Court recognizes that in compelling the Board's compliance with the ALJ's order, the Court exercised its authority pursuant to 42 U.S.C. § 1983, not the IDEA.   See Note 1, supra.   The award of attorney's fees for Plaintiffs' success before the ALJ is made pursuant to the IDEA.   This technical distinction does not require that a different standard be applied to the award of fees under these separate statutes, since the standard for assessing whether a litigant is a "prevailing party," and whether an award of fees is reasonable, is "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'"   John T., 318 F.3d at 555 n.4 (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 n.7 (1983)).

Board in civil contempt of this Court's injunctive order.  These
enforcement orders impacted the legal relationship between the
parties in a manner that was "judicially sanctioned."  P.N., 442
F.3d at 853 (internal quotations and citations omitted).  The
Court's orders, which "carrie[d] all of the 'judicial imprimatur'
necessary to satisfy Buckhannon," People Against Police Violence,
520 F.3d at 233 (citation omitted), were neither mere "judicial
pronouncement[s] unaccompanied by judicial relief," Select Milk
Producers, 400 F.3d at 947, nor awards of interim relief that
were "ultimately reversed, dissolved, or otherwise undone by the
final decision in the same case."  People Against Police
Violence, 520 F.3d at 232 (internal quotations and citations
omitted).  To the contrary, as explained above, the final
decision in this case – the denial of the Board's motion for
summary judgment on its counterclaim – affirmed Plaintiffs'
status as prevailing parties, thereby sustaining the Court's
prior orders enjoining the Board to comply with ALJ Martone's
prescriptions for L.J.'s educational programming.

     Because Plaintiffs secured "concrete and irreversible
redress," Select Milk Producers, 400 F.3d at 942, both in the
administrative action and in the proceedings before this Court,
the Court finds that Plaintiffs were the prevailing parties and
are thereby entitled to an award of reasonable attorney's fees
for Mr. Epstein's efforts in litigating the case at the

24

administrative level and before this Court.

## 2.   Reasonableness of Requested Fee

Having determined that Plaintiffs are entitled to an award of attorney's fees, the Court must next determine the quantum of fees that would constitute a reasonable award for Mr. Epstein's services.  The Court's approach in assessing the reasonableness of a claim for attorneys' fees is governed by the "'lodestar' formula, which requires multiplying the number of hours reasonably expended by a reasonable hourly rate." Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001) (citing Hensley, 461 U.S. at 424); see also McCutcheon v. America's Servicing Co., --- F.3d ----, 2009 WL 723601, at *7 (3d Cir. Mar. 20, 2009).  The Court addresses the reasonableness of Plaintiffs' attorney's claimed hourly rate and the number of hours for which Mr. Epstein seeks to be reimbursed in turn below.

### a.   Hourly Rate

Mr. Epstein, who bears the burden of proof as to the reasonableness of his claimed hourly rate, see Interfaith Community Organization v. Honeywell Intern., Inc., 426 F.3d 694, 703 n.5 (3d Cir. 2005), seeks to be compensated at the rate of $400 per hour.  In support of his application, Mr. Epstein asserts that his hourly rate was previously $300, but that his

new "hourly rate of $400 became effective on January 1, 2008."[11]
(Epstein Aff. at 5.)  In support of his assertion that this is a
reasonable hourly rate, Mr. Epstein states that he graduated from
law school twenty years ago and practices primarily in the field
of education law.  (Id.)  As evidence of the purported
reasonableness of his $400 hourly rate, Mr. Epstein submits the
affidavits of two attorneys: an affidavit of one John McGahren,
Esq., a Newark-based environmental law practitioner who bills at
$575 per hour, (McGahren Aff. ¶ 20), and an affidavit of a
Philadelphia-based education law practitioner with twenty-nine
years of experience who bills at $375 per hour.  (McAndrews Aff.
at 2-3.)

     Plaintiffs have not carried their burden of proving that Mr.
Epstein's claimed $400 hourly rate is reasonable.

> When computing a lawyer's fee under a fee-shifting
> statute, the judge's objective is to approximate the fee
> the lawyer would have obtained in the market for legal
> services . . . .  The best evidence of the lawyer's
> quality is the fee he commands in the market, but such

---

[11]  The Court explains below why $400 is not a reasonable
hourly rate for Mr. Epstein's services.  It bears recognition at
the outset, however, that even if Mr. Epstein had sustained his
burden of showing that $400 was a reasonable hourly rate, that
rate would not apply to the majority of the billings in this
action, since Mr. Epstein's $400 hourly rate did not "bec[o]me
effective" until January 1, 2008, (Epstein Aff. at 5), well after
the majority of the hours he billed in this matter had been
expended.  Because $400 is not a reasonable hourly rate for Mr.
Epstein's services, the Court need not untangle what it means for
his new rate to have "bec[o]me effective" on January 1, 2008,
(id.), when Mr. Epstein has adduced no evidence to suggest that
he has ever billed a single client at such a rate.

> evidence may not be available if the lawyer is usually
> compensated by a court-awarded fee, which is [Mr.
> Epstein's] situation . . . . In the absence of a reliable
> market test of his own services, [Mr. Epstein] had to
> show that lawyers of comparable ability commanded the
> rate he was asking the judge to assess.

Fogle v. William Chevrolet/Geo, Inc., 275 F.3d 613, 615-16 (7th

Cir. 2001) (citations omitted).  Mr. Epstein has shown neither

that $400 is the "fee he commands in the market," id. at 615, nor

that "lawyers of comparable ability commanded the rate" at which

he wishes to be compensated.  Id. at 616.  With regard to the

former, the Court afforded Mr. Epstein the opportunity to submit

any billing statement "in which he has charged fee-paying clients

at a rate exceeding $250 per hour . . . over the last six

months," (Docket Item 96 at 1), and Mr. Epstein stated that he

had no such records.

Nor do the two attorney affidavits Mr. Epstein has submitted

suggest that he is entitled to an hourly rate of $400.  Mr.

McGahren's affidavit is entirely irrelevant to this case.  There

is no suggestion from his affidavit that Mr. McGahren has ever

practiced in the field of education law, and his apparent area of

specialization – complex environmental litigation – is not

remotely comparable to Mr. Epstein's.  Compare HRW Systems, Inc.

v. Washington Gas Light Co., 823 F. Supp. 318, 346 (D. Md. 1993)

("Given the complexity of the statutory scheme in this area, the

current billing practices of the law firms that are able to

devote the time and expertise into litigating these cases, as

well as the length of time which litigation of this complexity
must take, the only conclusion to be drawn is that environmental
litigation is an extremely expensive business"), with A.V., 2008
WL 4126254, at *5 (concluding that "$250 is a generous hourly
fee" for education law practitioners in the southern New Jersey
market) (citation omitted); see also Fogle, 275 F.3d at 616
("There are almost a million lawyers in the United States, and if
[this] affidavit counts as evidence there will never be a case in
which a lawyer can't produce the . . . affidavit of another
lawyer that his market value is whatever he says it is").

        Nor does the affidavit of Mr. McAndrews support the
reasonableness of the hourly rate to which Mr. Epstein asserts he
is entitled.  Mr. McAndrews has been a member of the bar for nine
years longer than Mr. Epstein, (McAndrews Aff. at 2); he has been
practicing in Mr. Epstein's field for six years longer than Mr.
Epstein has, (id.); Mr. McAndrews is based out of Philadelphia,
"a large metropolitan area . . . [where] the rates charged by
attorneys . . . are likely to be higher than those charged by
attorneys practicing [in southern New Jersey]," Gates v.
Barnhart, 325 F. Supp. 2d 1342, 1345 (M.D. Fla. 2002); and yet
Mr. McAndrews bills at a lower rate than Mr. Epstein seeks
herein.  The only conceivable evidentiary significance of the
McAndrews affidavit is its strong suggestion that Mr. Epstein is
entitled to considerably less than the $400 hourly rate to which

he asserts he is entitled.

The Court, consistent with the directives of the Court of Appeals, see Planned Parenthood of Cent. New Jersey v. Attorney General of New Jersey, 297 F.3d 253, 265 n.5 (3d Cir. 2002), afforded Mr. Epstein the opportunity to introduce additional evidence pertaining to the market rate at an evidentiary hearing, (Docket Item 103 at 1), an opportunity of which Mr. Epstein declined to avail himself:

> The following is in response to your order of yesterday which offered to hold an evidentiary hearing regarding my requested hourly rate of $400.  I decline such an invitation for the reasons stated below but if this Court so Orders I request a pre-trial management order and the opportunity to update my fee demand.

(Docket Item 104 at 1, footnote omitted.)  Mr. Epstein's chief reason for not wishing to attend an evidentiary hearing appears to be because the Court "did not require an evidentiary hearing when [it] previously set [his] hourly rate at $300."  (Id.) (citing Deptford Township School Dist. v. H.B., No. 01-784, 2006 WL 891175 (D.N.J. Mar. 31, 2006)).  As a matter of law, no hearing was required in Deptford, the case invoked by Mr. Epstein, because, in contrast with this matter, the defendant in that case did not "object to the $300 hourly fee."  Deptford, 2006 WL 891175, at *5; see also Planned Parenthood, 297 F.3d at 265 n.5 (evidentiary hearing on market rate is called for only

where the rate in question is disputed).[12]

Plaintiffs have thus failed to establish that the reasonable market rate for the services of an attorney in Mr. Epstein's position begins to approach $400 per hour, a matter as to which Plaintiffs bear the burden of proof.  See Interfaith Community Organization, 426 F.3d at 703 n.5.  In the absence of evidence suggesting that Mr. Epstein's stated rate is reasonable, the Court's determination of the appropriate reasonable hourly rate for Mr. Epstein's services will be as follows.  First, the Court takes judicial notice of recent decisions of courts in this District, which have awarded attorney's fees to practitioners in Mr. Epstein's area of practice at the hourly rate of between $250 and $300.  See, e.g., A.V., 2008 WL 4126254, at *5 ("$250 is a generous hourly fee" for education law practitioners in the southern New Jersey market) (citation omitted); S.A. v. Riverside Delanco School Dist. Bd. of Educ., No. 04-4710, 2006 WL 827798, at *5 (D.N.J. Mar. 30, 2006) (same); J.N. v. Mt. Ephraim Board of Educ., No. 05-2520, 2007 WL 4570051, at *3 (D.N.J. Dec. 21, 2007) ($300 hourly rate for same market).

The Court finds that "$250 is a generous hourly fee" for Mr. Epstein's services in litigating this matter.  A.V., 2008 WL

---

[12]  As the Court recognized in Note 4, supra, Mr. Epstein seeks to be awarded $1,000 in attorney's fees for having drafted a response to the Court's letter concerning the evidentiary hearing.  (Docket Item 104 at 2 n.5)

4126254, at *5 (citation omitted).  In rendering this
determination, the Court acknowledges that Mr. Epstein has
previously been awarded fees at a $300 hourly rate in actions in
which defendants did not contest his rate.  See, e.g., J.N., 2007
WL 4570051, at *3.  The Court is mindful, however, that "[t]he
quality of representation . . . generally is reflected in the
reasonable hourly rate," Blum, 465 U.S. at 899 (internal
quotations omitted), and, in light of the considerations set
forth below, the Court concludes that an award at the $300 hourly
rate cannot be justified in this case.

It is the Court's finding, based on its observations of the
proceedings herein, that on numerous occasions throughout the
litigation of this case, Mr. Epstein engaged in "unnecessarily
contentious, unprofessional and unproductive conduct," using this
litigation as "an environment . . . to continue the contentious
interpersonal dispute" he and defense counsel appear to have
initiated before this action commenced.  Sukenic v. Maricopa
County, No. 02-2438, 2004 WL 3522693, at *14 (D. Ariz. July 21,
2004); see also Lee v. American Eagle Airlines, Inc., 93 F. Supp.
2d 1322, 1324 (S.D. Fla. 2000) (holding that "unprofessional and
disruptive conduct of counsel which prolongs the proceedings and
creates animosity which interferes with the resolution of a cause
can be considered in determining an award of attorney's fees");
Schafler v. Fairway Park Condominium Ass'n; 324 F. Supp. 1302,

31

1324 (S.D. Fla. 2004) (same).  The Docket in this action is
replete with unnecessarily acrimonious submissions and
unproductive outbursts from Mr. Epstein [e.g., Docket Items 59,
68, 75, and 81], and trivial disputes between counsel repeatedly
escalated to the point of necessitating an extraordinary level of
judicial intervention.  Courts have frequently recognized that
"the manner in which a lawyer interacts with opposing counsel and
conducts himself before the Court is as indicative of the
lawyer's ability and skill as is mastery of the rules of
evidence."  Lee, 93 F. Supp. 2d at 1330; see also, e.g., Sukenic,
2004 WL 3522693, at *18 (same).  Under the circumstances of this
case, the Court finds that Mr. Epstein's unproductive conduct and
poor professional judgment negatively impacted "[t]he quality of
representation," and must be "reflected in the reasonable hourly
rate."[13]  Blum, 465 U.S. at 899.

In short, the Court concludes that Plaintiffs have not
sustained their burden of proving the reasonableness of Mr.
Epstein's asserted $400 hourly rate.  In light of the
considerations reviewed above, the Court concludes that an hourly
rate of $250 is reasonable – and generous – under the

_____

[13]  It goes without saying that there is a critical
distinction between zealous advocacy on behalf of a client's
interests, on the one hand, and an attorney's unwillingness to
exercise professional judgment and restraint in launching
personal attacks at opposing counsel, on the other hand.  E.g.,
(Docket Item 81 at 1.)

circumstances of this case.  As this Court has previously
observed, "$250 is a generous hourly fee for such litigation in
this area, . . . [and the Court will accordingly insist] upon the
high degree of efficiency and effectiveness that an attorney
rating such a fee should demonstrate."  <u>A.V.</u>, 2008 WL 4126254, at
*5 (citation omitted).

      b.   <u>Hours Reasonably Expended</u>

     Having determined that $250 per hour is a reasonable hourly
rate for Mr. Epstein's services, the Court now turns to the hours
Mr. Epstein spent litigating this case to determine whether those
hours were "reasonably expended."  <u>Maldonado</u>, 256 F.3d at 184.
As the Court of Appeals has explained, "[w]hile it is true that .
. . the district court cannot decrease a fee award based on
factors not raised at all by the adverse party, nonetheless, the
burden remains on the party requesting the fee to prove its
reasonableness, and the court has a positive and affirmative
function in the fee fixing process, not merely a passive role."
<u>Interfaith Community Organization</u>, 426 F.3d at 713 (internal
quotations and citations omitted).

     According to his billing records, Mr. Epstein spent a total
of 235.8 hours litigating this matter before the ALJ and this
Court.  (Epstein Aff. Ex. B at 6.)  Defendant objects to numerous
billing entries as inappropriate or excessive.  The Court reviews
Defendant's objections to the reasonableness of the hours

33

reflected in Mr. Epstein's billing records below.

i.   <u>Billings for Clerical Tasks</u>

Defendant raises several objections to entries on Mr. Epstein's billing records related to the performance of administrative or clerical tasks.  First, as Defendant notes, the single largest expenditure of time for any listing in Mr. Epstein's records is a total of 26.2 hours spent logging his billing entries over the course of litigating this case, for which Mr. Epstein seeks to be awarded an astounding $10,480 in attorney's fees.  (Epstein Aff. Ex. B at 6.)  It goes without saying that

> [s]uch clerical work is not properly billed at the rate of . . . [an experienced attorney like Mr. Epstein]. <u>Halderman v. Pennhurst State Sch. & Hosp.</u>, 49 F.3d 939, 942 (3d Cir. 1995) (it is not appropriate to allow "the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals"); <u>Jordan v. CCH, Inc.</u>, 230 F. Supp. 2d 603, 612 (E.D. Pa. 2002) (excluding hours from fee petition that did not require attorney's legal knowledge and training).

<u>E.E.O.C. v. Federal Express Corp.</u>, 537 F. Supp. 2d 700, 724 (M.D. Pa. 2005).  This is especially true in light of the fact that logging a billing entry takes merely seconds to complete, not the six minutes Mr. Epstein claims to have expended on logging each entry.  The 26.2 hours Mr. Epstein claims to have spent keeping a log of his hours is unreasonable on its face, and borderline conscience-shocking, <u>see</u> <u>Deptford</u>, 279 Fed. Appx. at 126 n.2, and will be deducted from the fee award.

34

The same is true of Mr. Epstein's billings for certain
email-related activities, as Defendant's objection to Plaintiff's
motion makes clear.  The record contains thirty-seven entries
marked "review ECF e-mail," (Epstein Aff. Ex. A at 2-6), which
refers to the automatic email that the electronic docketing
system sends out to attorneys when any activity in a case
occurs.[14]  The ECF system sends out an email to an attorney to
notify him or her of case activity, whether or not the activity
in question was the attorney's own action.  In this case,
numerous billing entries exist in which Mr. Epstein filed a
submission on the docket, received an automatic email
confirmation of his own filing, and billed 0.1 hours of work at
his desired rate of $400 per hour for having read the automatic
form email.  For instances in which the ECF emails did not relate
to Mr. Epstein's own filing activities, he logged one billing
entry for having read the automatic ECF form email, and a
separate entry for having read the document to which it
pertained, as the records make clear.  (Epstein Aff. Ex. A at 2-
6.)  As one court recently observed in the face of an attorney's
effort to bill for reviewing email confirmations of ECF filing
receipts, "[n]ot only would these tasks normally consume a matter

---

[14]   The thirty-seven entries (one of which consumed not 0.1
hours, but 0.3), plus the two entries marked "review notice of
filing and hearing," (Epstein Aff. Ex. B at 1), add up to a total
of 4.1 attorney hours.

of seconds, but they would ordinarily be performed by secretarial or non-legal staff, not a $275 per hour attorney."  Garner v. Grenadier Lounge, No. 06-13318, 2008 WL 4852963, at *2 (E.D. Mich. Nov. 7, 2008).  The 4.1 hours Mr. Epstein logged performing these activities were not reasonably expended, and these hours will accordingly be deducted from the fee award.

Finally, Defendant objects to the 3.8 hours Mr. Epstein expended in responding to the Board's November 14, 2006 email,[15] wherein the Board requested that Mr. Epstein send an estimate of his attorney's fees for settlement purposes.  According to Plaintiffs, "[i]t took 3.8 hours to prepare the documents that defendant's business manager requested."  (Pl.'s Reply Br. at 8.) Considering that Mr. Epstein spent 26.2 hours keeping track of his billing entries over the course of this litigation, it should not have taken 3.8 hours for Mr. Epstein to have provided an estimate of his attorney's fees.  The Court will deduct these 3.8 hours from the fee award.

### ii.  Trial Preparation and Travel Time

Audubon identifies numerous specific entries in Mr. Epstein's billing records which it argues are excessive in light of the "high degree of efficiency and effectiveness that an

---

[15]  This email appears as an unlabeled exhibit attached to Plaintiffs' reply brief.

36

attorney rating . . . [a $250 hourly] fee should demonstrate."[16]
A.V., 2008 WL 4126254, at *5 (citation omitted).  First, Audubon
objects to the time Mr. Epstein spent preparing for the trial
before the ALJ, arguing that Mr. Epstein's 16.4 hours of trial
preparation, trial, and travel for the August 18, 2006 trial day,
and 8.5 hours of trial preparation, trial, and travel for the
September 18, 2006 trial day are excessive.  Having considered
Mr. Epstein's indications that he spent 1.5 hours traveling to
and from the hearings each day[17] and that, in addition to the
eight-hour trial day, the billed time includes hours of pretrial
preparation, the Court does not find that these hours were
unreasonably expended.

   iii. Post-Trial Motion Practice

   Defendant next objects to the hours Mr. Epstein expended on
post-trial motion practice before the ALJ.  Mr. Epstein spent
11.3 hours to "research, draft and file trial brief" on September
24, 2006 and 3.9 hours preparing and submitting a reply brief on

---

[16]   The Court is not persuaded by Defendant's argument that
certain entries such as "office conference" or "review letter
from attorney" are so vague that it cannot evaluate the
reasonableness of the entry.  Mr. Epstein's records are
sufficiently specific.  See Washington v. Philadelphia County
Court of Common Pleas, 89 F.3d 1031, 1037-38 (3d Cir. 1996).
Indeed, since the entries are dated, it is not difficult to line
the billing entries up against the Docket to view the precise
letter, order, etc., to which a billing entry corresponds.

[17]   Attorney travel time is compensable in New Jersey, as
the Court of Appeals has recognized.  See Planned Parenthood, 297
F.3d at 267.

October 1, 2006.  As Audubon points out, "once the Board could
not present a case [as a result of the ALJ's exclusionary order],
what was there to brief beyond a recitation of the testimony from
those two witnesses?"  (Def.'s Opp'n Br. at 8.)  The Court has
reviewed the submissions Plaintiffs presented to the ALJ,[18] and
it agrees with Defendant that, after the ALJ granted Plaintiffs'
motion to exclude the entirety of the Board's evidence, the hours
Mr. Epstein spent summarizing the unrebutted testimony of his own
witnesses are excessive.  This is particularly true of the
October 1, 2006 reply brief, which is less than two pages long,
and should not have taken an attorney with Mr. Epstein's
experience 3.9 hours to prepare.  See, e.g., Apple Corps. Ltd. v.
International Collectors Soc., 25 F. Supp. 2d 480, 490-91 (D.N.J.
1998) ("the higher the allowed hourly rate commanded based upon
skill and experience, the shorter the time it should require an
attorney to perform a particular task") (citation omitted).  The
Court will accordingly reduce the hours spent on these post-trial
submissions by half, to 5.7 for the trial brief, and 1.9 for the
two-page reply brief.

    iv.  Drafting the Complaint

The Court next addresses Defendant's objection to the 5.1
hours Mr. Epstein spent drafting the Complaint in this matter,

---

[18]  These submissions appear as unlabeled exhibits attached
to Plaintiffs' reply brief.

38

which Defendant characterizes as "standard and uncomplicated."[19]
(Def.'s Opp'n Br. at 8.)  Plaintiffs defend the reasonableness of
this expenditure of time, explaining that "[t]he 5.1 hours
charged was reasonable under the circumstances in that a great
deal of time was expended with the client during the drafting
process in order to consider what causes of action to add or
leave out of the complaint in this case where a witness employed
by defendant testified [that] defendant intentionally deprived
plaintiffs of agreed to services."  (Pl.'s Reply Br. at 8.)
Ultimately, irrespective of how much time Mr. Epstein spent
contemplating additional hypothetical causes of action that were
not pleaded, the only cause of action that was included in the
Complaint was a request for attorney's fees.  The Court concludes
that the hours Mr. Epstein spent analyzing causes of action that
ultimately were not alleged, much less prevailed upon, are not
recoverable, see McCutcheon, --- F.3d ----, 2009 WL 723601, at
*7, and finds that the hours billed for drafting the Complaint –
which amounts to little more than a recitation of the ALJ's final
order – are thus excessive.  The Court will accordingly reduce by

---

[19]  Defendant does not object to the 2.1 hours Mr. Epstein
spent drafting the Amended Complaint.  The Court notes that the
only difference between these two pleadings is the addition of
several quotation marks, a civil action number, and a few short
sentences to the Amended Complaint.  However, because the Court
"cannot decrease a fee award based on factors not raised at all
by the adverse party," Interfaith Community Organization, 426
F.3d at 713 (internal quotations and citations omitted), these
2.1 hours will not be reduced.

half the hours billed drafting the Complaint, from 5.1 to 2.5.

v.   <u>Hours Expended on Submissions as to Which
Plaintiffs did not Prevail</u>

Defendant objects to the hours Mr. Epstein spent drafting an
order to show cause seeking to compel the Board's compliance with
the ALJ's final order [Docket Item 5] and a motion for
preliminary injunctive relief [Docket Item 17], asserting that
Mr. Epstein should not be compensated for such hours because
Plaintiffs did not prevail on any aspect of either motion.
Defendant likewise objects to the 4.9 hours Mr. Epstein spent in
drafting Plaintiffs' unsuccessful opposition [Docket Item 24] to
the Board's motion to set aside the Clerk's entry of default
[Docket Item 22].

As to Plaintiffs' motions seeking preliminary injunctive
relief, Defendant is incorrect when it asserts that Plaintiffs
did not prevail on <u>any</u> aspect of either motion.  Contrary to
Defendant's argument, Plaintiffs prevailed on aspects of these
motions, in that the Court granted Plaintiffs' motion for
preliminary injunctive relief, but denied their motion seeking to
hold members of the Board in civil contempt of the ALJ's final
order [Docket Items 41 and 42].  With regard to the contempt
motion, the Court noted that Plaintiffs' motion was premised upon
an erroneous legal theory, because a court "does not have the
authority to hold a party in contempt of another tribunal's
orders."  (Docket Item 41 at 24) (citing, <u>inter alia</u>, Fed. R.

40

Civ. P. 4.1, Notes of Advisory Committee ("Contempt proceedings, whether civil or criminal, must be brought in the court that was allegedly defied by a contumacious act")).

The Court finds that Mr. Epstein should be compensated for the hours spent drafting the successful portions of the motions seeking preliminary injunctive relief, but not for the hours spent on the unsuccessful and meritless aspect of the motion seeking a finding of civil contempt. <u>See</u>, <u>e.g.</u>, <u>Lebron v. Washington Metropolitan Area Transit Authority</u>, 665 F. Supp. 923, 927 (D.D.C. 1987) (deducting from fee award the hours an otherwise prevailing attorney spent drafting an unsuccessful sanctions motion).  Looking to the contents of Plaintiffs' motions [Docket Items 5 and 17], it appears that Mr. Epstein spent an equal amount of time on the successful and meritless aspects of the November 24, 2006 filing, whereas the January 9, 2007 filing was dedicated entirely to the motion for preliminary injunctive relief.  The Court will accordingly reduce the hours awarded for Mr. Epstein's work on the first of these motions by half, from 6.9 to 3.5, but finds that the 6.3 hours spent on the second motion were reasonably expended.  As to Plaintiffs' unsuccessful opposition to Defendant's motion to set aside the entry of default, the Court agrees with Defendant that Plaintiffs did not prevail on this matter, and will deduct the 4.9 hours Mr. Epstein spent drafting this submission from the fee award.

41

See Lebron, 665 F. Supp. at 927.

      vi.   Second Contempt Motion and Summary Judgment
            Motion Practice

      The Court next addresses Defendants' objections to the hours
Mr. Epstein expended in drafting Plaintiffs' motion [Docket Item
45] seeking to hold Defendant in contempt of the Court's November
5, 2007 Order [Docket Item 42], and in drafting Plaintiffs'
opposition [Docket Items 75 and 82] to Defendants' motion for
summary judgment.  Originally, Mr. Epstein stated that he spent
8.9 hours drafting the four-page brief in support of Plaintiffs'
contempt motion, and 7.3 hours drafting the March 18, 2009 two-
page letter in opposition to Defendants' summary judgment motion.
In his reply brief in support of his motion for attorney's fees,
however, Mr. Epstein states that "it appears that . . . [these]
charge[s] w[ere] in error," (Pls.' Reply Br. at 9), and that Mr.
Epstein in fact spent just 0.9 hours drafting the contempt motion
and 0.3 hours drafting the opposition brief to the summary
judgment motion.

      The Court is troubled by the fact that Mr. Epstein, who
claims to have spent six minutes logging each billing entry, made
what would have amounted to a $6,000 mistake at his desired $400
per hour rate, and strongly admonishes Mr. Epstein to exercise
substantially greater caution if his billing records are to serve
as the basis of his entitlement to an award of attorney's fees.
As one court has explained:

Counsel for the party claiming the fees has the burden of proving hours to the district court by submitting meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks. A district court is justified in reducing the reasonable number of hours if the attorney's time records are "sloppy and imprecise" and fail to document adequately how he or she utilized large blocks of time.

Case v. Unified School Dist. No. 233, Johnson County, Kan., 157 F.3d 1243, 1250 (10th Cir. 1998) (citations omitted, emphasis added). The fifteen hours which Mr. Epstein erroneously added to his billing records will be deducted from the fee award.

The Board also objects to the reasonableness of Mr. Epstein's expenditure of 6.5 hours in drafting Plaintiffs' May 1, 2008 brief in opposition to the Board's motion for summary judgment. The Court, having reviewed this submission, does not find that these hours were unreasonably expended, and denies the Board's request to reduce the fees sought for Mr. Epstein's work on this submission.

vii. Litigation of Fee Application

Finally, Defendant objects to the time Mr. Epstein spent litigating this fee application. Mr. Epstein seeks to be compensated for the 6.9 hours he spent drafting his fee application, the five hours he spent filing a reply brief in further support of his fee application, and the 2.5 hours he spent drafting an approximately one-page letter in which he "decline[d]" the Court's "invitation" to convene an evidentiary

hearing as to the reasonableness of his hourly rate.  (Docket Item 104 at 1.)

        As the Court of Appeals has made clear, "[a] party entitled to an award of attorneys' fees is also entitled to reimbursement for the time spent litigating its fee application, . . . [but] a request for attorney's fees should not result in a second major litigation."  Planned Parenthood, 297 F.3d at 268 (citation omitted).  In light of these cautionary words, it is noteworthy that Mr. Epstein spent 14.4 hours litigating his application for attorney's fees, which is greater than the amount of time he expended on the litigation of any particular substantive submission in the history of this case.  Having reviewed the contents of Mr. Epstein's fee application, his reply brief, and his March 14, 2009 letter, the Court agrees with Defendant that 14.4 hours is well in excess of the time an experienced attorney should reasonably have spent litigating this fee application. The Court finds that the 2.5 hours Mr. Epstein devoted to the short and ineffectual March 14, 2009 letter were not reasonably expended, and will deduct these hours from Mr. Epstein's fee application.  As to the remaining 11.9 hours, the Court will reduce this amount by half, finding that the litigation of this fee application should have consumed no more than six hours of an experienced attorney's time.

      3.   <u>Summary of Fee Award</u>

Deducting from Mr. Epstein's fee application those hours which were not "reasonably expended" in litigating this matter, <u>Maldonado</u>, 256 F.3d at 184, the Court will award attorney's fees for 177.2 hours over the course of prosecuting this case. Multiplying these hours by the rate of $250 per hour yields a total award of $44,300.  No objection having been raised to the $646 in costs Plaintiffs incurred, the Court will grant Mr. Epstein's application for an award of such costs, yielding a total of $44,946 in fees and costs to be awarded to Mr. Epstein.

**IV.  CONCLUSION**

For the reasons discussed above, the Court will deny the Board's motion for leave to file an untimely appeal, and will grant Plaintiffs' motion for an award of attorney's fees and costs to Mr. Epstein, reducing the amount of such an award as set forth herein to $44,946.  The accompanying Order is entered.

**April 13, 2009**                **s/ Jerome B. Simandle**
Date                          JEROME B. SIMANDLE
                              United States District Judge